# EXHIBIT A

COPY FOR SERVICE

**Court of Common Pleas, Auglaize County, Ohio**
**SUMMONS**
**CASE NO. 2024 CV 0110**

SUMMONS ON COMPLAINT

ROGER EGBERT
511 WILSON AVE.
SIDNEY, OH 45365

Plaintiff

VS

CROWN EQUIPMENT CORPORATION
ATTN: KATHY A. DOESCK
44 SOUTH WASHINGTON STREET
NEW BREMEN, OH 45869

Defendants

To the above named Defendants

You are hereby summoned that a complaint (a copy of which is hereto attached and made a part hereof) has been filed against you in this court by the plaintiff named herein.

You are hereby required to serve upon the plaintiffs' attorney, or upon the plaintiff if they have no attorney of record, a copy of your answer to the complaint within 28 days after service of this summons upon you, exclusive of the day of service. Said answer must be filed with this court within three days after service on Plaintiffs' Attorney.

The name and address of the Plaintiffs' Attorney is as follows:

TERENCE R COATES ESQ.
MARKOVITZ, STOCK & DEMARCO, LLC
119 EAST COURT STREET, SUITE 530
CINCINNATI, OH 45202

If you fail to appear and defend, judgment by default will be taken against you for the relief demanded in the complaint.

MANDY L. DUNLAP, CLERK OF COURTS

BY: Ava Westfall
DEPUTY CLERK

August 28, 2024

AUGLAIZE COUNTY
COMMON PLEAS COURT
FILED

2024 AUG 28 AM 10: 29

MANDY L. DUNLAP
CLERK OF COURTS

2024 CV 0410

IN THE COURT OF COMMON PLEAS
AUGLAIZE COUNTY, OHIO

| | |
|---|---|
| **ROGER EGBERT,** *on behalf of himself and all others similarly situated,*<br>511 Wilson Ave.<br>Sidney, OH 45265<br><br>Plaintiff,<br><br>v.<br><br>**CROWN EQUIPMENT CORPORATION**<br>44 South Washington Street<br>New Bremen, Ohio 45869<br><br>Defendant. | **CASE NO.** ____________<br><br>**JUDGE** ____________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**PUTATIVE CLASS ACTION** |

Plaintiff Roger Egbert ("Plaintiff") brings this Class Action Complaint against Crown Equipment Corporation ("Crown" or "Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to his own actions and his counsel's investigations, and upon information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard personally identifiable information and protected health information belonging to its employees and their family members, including, but not limited to: names, Social Security numbers, drivers' license numbers, financial account information, and health information[1]

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on its face name an individual, but that are considered to be particularly sensitive and/or

(collectively "Private Information"). Upon information and belief, "health information" concludes protected health information ("PHI") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Despite its duties to Plaintiff and Class Members, Defendant stored their Private Information in a vulnerable portion of its IT environment.

2. Defendant began operating in 1945 and has taken place as one of the country's leading manufacturers of forklifts and other material handling equipment.[2] Defendant operates worldwide through 23 disparate manufacturing plants and more than 500 brick and mortar retail locations.

3. Upon information and belief, Defendant employs nearly 20,000 individuals, and collects, maintains, and stores highly sensitive Private Information belonging to those individuals and their family members.

4. Plaintiff and Class Members provided their Private Information to Defendant as a condition of receiving employment from Defendant.

5. On or about June 9, 2024, Defendant became aware of suspicious activity on its computer network and following an investigation, Defendant determined that an unknown third party had accessed its systems and the data stored therein (the "Data Breach").

6. Defendant did not notify Plaintiff or other Class Members until two months later month, finally sending a letter dated August 8, 2024 ("Notice of Data Breach")[3].

---

valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers).

[2] Crown Equipment Corp., https://www.crown.com/en-us/about-us.html (last visited Aug. 27, 2024).

[3] A template Notice of Data Breach letter is available at the website of the Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/27d01e13-84ad-4e71-a024-977d9ce7aa3a.html (last visited Aug. 27, 2024).

7. As a result of the Data Breach, Plaintiff and at least 13,858[4] Class Members suffered injury and ascertainable losses in the form of the present and imminent threat of fraud and identity theft, loss of the benefit of their bargain, out-of-pocket expenses, loss of value of their time reasonably incurred to remedy or mitigate the effects of the attack, and the loss of and diminution in value of their personal information.

8. In addition, Plaintiff's and Class Members' sensitive and confidential Private Information was compromised and unlawfully accessed due to the Data Breach. This information, while compromised and taken by unauthorized third parties, remains also in the possession of Defendant, and without additional safeguards and independent review and oversight, remains vulnerable to additional hackers and theft.

9. Particularly alarming is the fact that the Private Information compromised in the Data Breach included Social Security numbers, which are durable and difficult to change.

10. Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Plaintiff's and Class Members' Private Information that it collected and maintained, and for failing to provide adequate notice to Plaintiff and other Class Members that their information had been stolen by cyber-criminals.

11. Defendant maintained the Private Information in a reckless and negligent manner. In particular, Defendant maintained the Private Information in a database that was not encrypted, or password protected and therefore accessible, in a vulnerable portion of its "IT environment".[5] Foreseeably, cybercriminals exploited this obvious vulnerability and exfiltrated Plaintiff's and Class Members' Private Information from the database.

---

[4] *See id.*

[5] *See* Crown Data Security Notice Template, available at the Maine Attorney General's website: https://www.maine.gov/cgi-bin/agviewerad/ret?loc=1113 (last visited Aug. 27, 2024).

12. As a result of the Data Breach, Plaintiff and Class Members suffered ascertainable losses, including but not limited to, a loss of privacy, the loss of the benefit of their bargain, out-of-pocket monetary losses and expenses, the value of their time reasonably incurred to remedy or mitigate the effects of the attack, the diminished value of their Private Information, and the substantial and imminent risk of identity theft. This risk will remain with Plaintiff and Class Members for the rest of their lives.

13. Upon information and belief, Plaintiff's and Class Members' Private Information remains in Defendant's possession. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe and should be provided injunctive and other equitable relief.

14. Plaintiff seeks to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

15. Plaintiff seeks remedies including, but not limited to, compensatory damages, nominal damages, and reimbursement of out-of-pocket costs.

16. Plaintiff also seeks injunctive and equitable relief to prevent future injury on behalf of him and the putative Class.

**PARTIES**

17. Plaintiff Roger Egbert is an adult individual and, at all times relevant herein, has been a Citizen of Ohio residing in Sidney, Ohio.

18. Defendant Crown Equipment Corporation is an Ohio corporation for profit with its headquarters and principal place of business at 44 South Washington Street, New Bremen, Ohio, USA 45869, within Auglaize County. Defendant's Registered Agent is Kathy A. Doseck, at the same address.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action pursuant to R.C. 2305.01.

20. This Court has personal jurisdiction over Defendant because Defendant transacts business, contracts to supply services, and caused tortious injury by act or omission within the State of Ohio. Additionally,Defendant is a domestic corporation in good standing, incorporated under the laws of Ohio, with its principal place of its business in the State of Ohio, from which it conducts most if not all of its business operations, thus rendering the exercise of personal jurisdiction by this Court necessary and proper.

21. Venue is proper in Auglaize County, Ohio, under Ohio Rules of Civil Procedure Rule 3(C)(2) because Defendant has its principal place of business and conducted the activities that gave rise to this claim in this county.

## FACTUAL ALLEGATIONS

***Background***

22. Defendant manufactures and sells forklifts, other material handling devices, and auxiliary tools used in tandem, such as batteries. In offering theses services, Defendant employs individuals like Plaintiff and Class Members. In the course of that employment, Defendant stores, maintains, and uses Plaintiff's and Class Members' Private Information.

23. Defendant agreed to and undertook legal duties to maintain the Private Information of Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws.

24. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure, and that such an attempt to obtain said information was foreseeable.

25. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

26. Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosure of this Private Information.

27. Plaintiff and Class Members directly or indirectly entrusted Defendant with sensitive and confidential information, including their Private Information which includes information that is static, meaning it does not change, and can be used to commit myriad financial crimes.

28. Plaintiff and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand Defendant safeguard their Private Information.

29. Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties.

***The Data Breach***

30. On or around February 12, 2024, Defendant issued its Notice of Data Breach. Plaintiff's Notice of Data Breach states the following:

> As you may know, Crown Equipment Corporation ("Crown," "our," or "we") was recently the victim of a cyberattack and an unauthorized third party obtained limited access to our information technology (IT) environment. The purpose of this letter is to inform you that the privacy of certain personal data related to you and your family members, could have potentially been compromised during the incident. However, as we have previously communicated with you, we are highly confident **that any data impacted by this incident (including personal data) will not, and cannot, be misused in any way.**

We recognize that cybersecurity is a significant concern in today's world, and we know that some of our employees and their families have been impacted by other cyber attacks impacting schools, hospitals, and other businesses. Although we are confident that your personal data cannot be misused because of the cybersecurity incident that impacted Crown, we are offering you and your family members free credit monitoring and identity theft protection services as an additional proactive risk mitigation option. **Below are additional details regarding the data incident, as well as information on how to enroll in the credit monitoring and identity theft protection services.**

**What happened?**

On June 9, 2024, we discovered that a third party had gained unauthorized access to certain systems in out IT environments. In response, we immediately deployed security measures to contain and mitigate this threat, proactively took systems offline so we could conduct a comprehensive investigation, and retained a leading cybersecurity incident response team to accelerate our recovery efforts. Because of the security controls we implemented prior to this incident, we were able to contain this cyber threat and return to a normal state of business within days (instead of weeks or months).

In addition, as part of our response efforts, Crown proactively notified federal law enforcement agencies, and we received support from them and their cybersecurity partners. Specifically, they undertook their own operations to protect Crown, our employees, and our data. It is because of their efforts that we have high confident that any Crown data (including personal data) cannot be used for malicious purposes as a result of this cybersecurity incident.

**What Information Was Involved?**

As part of our investigation into this incident, we know that the main Human Resources (HR) data based was not accessed by any unauthorized third party. However, we discovered that portions of our IT environment that retained certain "census data" on our employees and their familiy members (e.g. enrollment in our benefits programs), certain data related to workplace injuries, and similar records we retain for administrative purposes, were compromised. These files and records contained sensitive personal data on some of our employees and their family members, such as their names, social security numbers, driver's license numbers, financial account information, and health information. If you would like to know what – if any – personal data related to you or your family members was impacted by this incident, please contact the helpdesk number below.

**Why Does Crown Have My Family's Personal Data?**

Crown retains HR records on our employees and their family members in order to administer our employee benefit programs (e.g. health and wellness programs).

> These records often contain personal data for authentication and regulatory compliance reasons. The personal data that we collect for HR-related purposes is not used for any other reason.
>
> **What We Are Doing / How We Responded**
>
> We take this event, and our information security obligations, seriously and we have taken action to remediate this cybersecurity incident and further enhance our prevention and mitigation efforts. As part of this process, we retained independent third-party IT security consultants to analyze the incident, including our information security tools and our data security methods. As noted above, we proactively notified federal law enforcement and regulatory authorities and we have been inContact with them regarding this incident. Last, our law enforcement and cybersecurity partners engaged in operations to better ensure that any Crown-related data (including personal data) impacted by this cybersecurity incident cannot be misused by the third party responsible for this incident or by anyone else.

31. Defendant's Notice of Data Breach admits that Plaintiff's and Class Members' Private Information was accessed via an external system data breach without authorization, and exfiltrated by cybercriminals.

32. The Notice of Data Breach attempts to confuse or mislead Plaintiff and Class Members by assuring them that their Private Information will not or "cannot" be misused by the third parties who now possess it.

33. Because Defendant failed to properly protect and safeguard Plaintiff's and Class Members' Private Information, an unauthorized third party was able to access Defendant's database, and then access and exfiltrate Plaintiff's and Class Members' Private Information stored on Defendant's email accounts.

34. Defendant created the risk of the Data Breach by failing to properly configure its email security, allowing unencrypted data to be accessed without a password or any form of multi-factor authentication. Defendant knew or should have known this, and as such owed Plaintiff and Class Members a duty of due care to protect their Private Information.

35. The reason for exfiltrating Plaintiff's and Class Members' Private Information is to

list the Private Information on the black market and sell it to the highest bidder, and therefore, it is likely the Plaintiff's and Class Members' Private Information is already available on the Dark Web. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. In turn, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

***Plaintiff Roger Egbert Experience***

36. Plaintiff Egbert is an employee of Defendant.

37. Plaintiff Egbert provided his Private Information to Defendant as a condition of receiving treatment services from Defendant.

38. Plaintiff Egbert is very careful about sharing his sensitive Private Information. Plaintiff Egbert has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Egbert stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Egbert diligently chooses unique usernames and passwords for his online accounts.

39. Plaintiff Egbert only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use reasonable security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access accounts storing his Private Information. As a result, Plaintiff Egbert's Private Information was within the possession and control of Defendant at the time of the Data Breach.

40. Plaintiff Egbert received a Notice of Data Breach from Defendant dated August 8, 2024, informing him of the Data Breach and confirming that his Private Information, including his name, Social Security numbers, driver's license number, financial account information, and

medical information, was compromised in the Data Breach.

41. Plaintiff Egbert suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

42. As a result of the Data Breach, Plaintiff Egbert has suffered injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff Egbert was deprived of when his Private Information was exfiltrated by a cybercriminal actor via the Data Breach.

43. The Data Breach has also caused Plaintiff Egbert to suffer imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties.

44. This risk from the Data Breach has caused Plaintiff Egbert to spend significant time dealing with issues related to the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, and self-monitoring his accounts and credit reports to ensure no

fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

45. The substantial risk of imminent harm and loss of privacy have both caused Plaintiff Egbert to suffer stress, fear, and anxiety.

46. As a result of the Data Breach, Plaintiff Egbert is at a present risk and will continue to be at increased risk of identity theft and fraud for the rest of her life.

47. The need to expend resources mitigating the future harm suffered by Plaintiff Egbert represents a concrete injury requiring remedy though a civil action.

48. Plaintiff Egbert also has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches, requiring injunctive and declaratory relief as sought through this Complaint.

***The Data Breach was Foreseeable***

49. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches seeking employee data across many industries holding significant amounts of Private Information preceding the date of the breach.

50. At all relevant times, Defendant knew, or should have known, that Plaintiff's and Class Members' Private Information was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff and Class Members' Private Information from cyberattacks that Defendant should have anticipated and guarded against.

51. The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of employees and

their family members, like Plaintiff and Class Members.

52. In light of recent high profile data breaches, Defendant knew or should have known that their electronic records and employees' Private Information would be targeted by cybercriminals and ransomware attack groups.

53. Certain types of information, such as that in Defendant's possession and exposed in this Data Breach, are prized by criminals. For example, cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[6]

54. The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[7]

55. Indeed, cyberattacks against the healthcare industry have been common for over ten years with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[8]

---

[6] *2022 Breach Barometer*, Protenus, *see* https://blog.protenus.com/key-takeaways-from-the-2022-breach-barometer (last visited Aug. 27, 2024).

[7] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year (last visited Aug. 27, 2024).

[8] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011),

56. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[9] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[10] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident in 2010, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[11]

57. Cyberattacks on any entity holding PHI, like Defendant, have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[12]

58. Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health

https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector (last visited Aug. 27, 2024).

[9] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, Healthtech Magazine (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.") (last visited Aug. 27, 2024).

[10] *Id.*

[11] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/privacy/study-medical-identity-theft-is-costly-for-victims/ (last visited Aug. 27, 2024).

[12] Ben Kochman, *FBI, Secret Service Warn of Targeted*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Aug. 27, 2024).

insurance information, and medical and clinical data, and that information can be easily monetized."[13]

59. Patient records, like those stolen from Defendant, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[14]

60. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

61. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[15]

62. Defendant was on notice that the FBI has recently been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[16]

---

[13] See *id.*

[14] See *id.*

[15] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack, Security Magazine* (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited Aug. 27, 2024).

[16] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters (Aug.

***Defendant Fails to Comply with FTC Guidelines***

63. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should factor into all business decision-making.

64. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[17] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and, have a response plan ready in the event of a breach.[18]

65. The FTC further recommends that companies not maintain PII longer than necessary for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

66. The FTC has brought enforcement actions against businesses for failing to

2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idINKBN0GK24U20140820 (last visited Aug. 27, 2024).

[17] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Aug. 27, 2024).

[18] *Id.*

adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67. These FTC enforcement actions include actions against healthcare providers and partners like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

68. Defendant failed to properly implement basic data security practices.

69. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

70. Defendant was at all times fully aware of its obligation to protect the Private Information of customers and patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Fails to Comply with Industry Standards***

71. As shown above, experts studying cybersecurity routinely identify healthcare providers and partners as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

72. Several best practices have been identified that at a minimum should be implemented by healthcare providers like Defendant, including but not limited to; educating all

employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

73. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

74. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

75. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the data breach.

***Defendant's Decision to Store its Patients' Private Information on Employee Email Accounts is Particularly Egregious Reckless***

76. It is widely understood that sensitive data should not be stored on email accounts, regardless of standard protections like passwords and multifactor authentication. It is further understood that if sensitive information is transmitted via email, it should be deleted as soon as possible.

77. As an article by the University of Buffalo explains, "[t]he truth is that email is not

a secure channel for sending information. Therefore, you should never send sensitive data or information in an email, whether written in the body or as an attachment."[19]

78. Further online guidance provides that,

> While email remains convenient for everyday communication, it is crucial to recognize its limitations in safeguarding personal information. The lack of encryption, susceptibility to data breaches, phishing attacks, and insecure recipient devices all contribute to the inherent risks. To ensure the security and privacy of sensitive data, it is advisable to explore alternative methods of communication that prioritize encryption and data protection. These methods include encrypted messaging apps or secure file transfer services.[20]

79. An article from Contentsnare.com states, **"you should not be sending sensitive information using email.** The system is not secure, and it's easy for hackers to access sensitive data."[21] (Emphasis in original).

80. Similarly, an article from the University of California explains that an individual should "[n]ever assume that email, instant messages (IM), texts, or attachments are private or confidential. Don't send … sensitive information via email or instant message (IM). These are not secure methods of communication."[22] The article further instructs that if any sensitive information is on an email account despite this warning, the user should "keep it for the shortest amount of time possible and delete it securely. This includes attachments."[23]

[19] Joe Ferguson, *Keep Sensitive Data Safe: don't' send in emails*, UB Information Technology (Mar. 1, 2021), https://www.buffalo.edu/ubit/news/article.host.html/content/shared/www/ubit/ /news/2019/keep-sensitive-data-safe.detail.html (last visited Aug. 27, 2024).

[20] Grand Valley State University Office of the Vice President for Information Technology, *Know the Risks of Emailing Personal Information*, IT News (July 12, 2023) https://www.gvsu.edu/it/ vp/module-news-view.htm?storyId=E6853E9D-C2CC-5EA9-CD928AE928177627&siteModule Id=F686549C-9889-E15B-58776D755483A62F (last visited Aug. 27, 2024).

[21] Drazen Vujovic, *How to send sensitive information via email*, Content Snare (June 17, 2024), https://contentsnare.com/sensitive-information-email (last visited Aug. 27, 2024).

[22] UC Santa Cruz Information Technology Services, *Protecting Information in Email and IM/Texts*, https://its.ucsc.edu/security/internet.html (last visited Aug. 27, 2024).

[23] *Id.*

81. An article from UNLV warns against using email to store sensitive documents and states that "[t]he more information that exists on a computer or on network storage, the more than can be stolen in the event of a data breach. If you no longer have a need for the data and have no legal obligation to retain it, delete it."[24]

***Cyberattacks and Data Breaches Cause Disruptions and Put Consumers at an Increased Risk of Fraud and Identity Theft***

82. Cyberattacks and data breaches at healthcare companies and partner companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

83. Researchers have found that among medical service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[25]

84. Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[26]

85. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[27]

---

[24] UNLV Information Technology, *Sensitive Data*, https://www.it.unlv.edu/cybersecurity/best-practices/sensitive-data (last visited Aug. 27, 2024).

[25] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks (last visited Aug. 27, 2024).

[26] *See* Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Research 971, 971-980 (2019), https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203 (last visited Aug. 27, 2024).

[27] *See* U.S. Gov. Accounting Office, GAO-07-737, *Personal Information: Data Breaches Are*

86. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

87. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[28]

88. Identity thieves use stolen personal information such as Social Security numbers

*Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (2007), https://www.gao.gov/new.items/d07737.pdf (last visited Aug. 27, 2024).

[28] *See* Federal Trade Commission, IdentityTheft.gov, https://www.identitytheft.gov/#/Steps (last visited Aug. 27, 2024).

for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

89. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

90. Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[29]

91. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has a great market value.

92. It must also be noted there may be a substantial time lag – measured in years – between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

93. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[29] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

*See* GAO Report, at p. 29.

94. Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

95. There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

96. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

97. Private Information can sell for as much as $363 per record according to the Infosec Institute.[30] Private Information is particularly valuable because criminals can use it to target victims with frauds and scams. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

98. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[31] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[32] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number

[30] *See* Ashiq JA, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Aug. 27, 2024).

[31] *Identity Theft and Your Social Security Number*, Social Security Administration (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Aug. 27, 2024).

[32] *Id.*

was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

99. Moreover, it is not an easy task to change or cancel a stolen Social Security number.

100. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, the new number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[33]

101. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[34]

102. Medical information is especially valuable to identity thieves.

103. Medical identity theft, in particular, is gravely serious, "when someone uses your personal information . . . to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care. If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance and benefits you're able to use. It could also hurt your credit."[35]

---

[33] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft

[34] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 9, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Aug. 27, 2024).

[35] *See* Federal Trade Commission, *What to Know About Medical Identity Theft* (May 2021),

104. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

105. Healthcare data record may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[36]

106. Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

107. For this reason, Defendant knew or should have known about these dangers and strengthened its data and email handling systems accordingly. Defendant was on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendant failed to properly prepare for that risk.

108. Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect patients' and customers' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

---

http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Aug. 27, 2024).

[36] Impravata, *Hackers, breaches, and the value of healthcare data,* (Jun. 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last visited Aug. 27, 2024).

d. Failing to ensure that its vendors with access to its computer systems and data employed reasonable security procedures;

e. Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

f. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

h. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

i. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

j. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

k. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

l. Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation

of 45 C.F.R. § 164.530(b);

m. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

n. Failing to adhere to industry standards for cybersecurity as discussed above; and

o. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

109. Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access Defendant's computer network and systems which contained unsecured and unencrypted Private Information.

110. Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and the Class Members also lost the benefit of the bargain they made with Defendant.

***Defendant Failed to Properly Protect Plaintiff's and Class Members' Private Information***

111. Defendant could have prevented this Data Breach by not using email to transfer and store Private Information. Even if it disregarded this risk, it could have prevented the Data Breach by properly securing and encrypting the email accounts containing the Private Information of Plaintiff and Class Members. Alternatively, Defendant could have destroyed the data, especially for individuals with whom it had not had a relationship for a period of time.

112. Defendant's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendant to protect and secure sensitive data they possess.

113. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class

Members from being compromised.

114. To prevent and detect unauthorized cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and

logical separation of networks and data for different organizational units.[37]

115. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against cyberattacks] and it is critical to take precautions for protection."[38]

116. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks....

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)....

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it....

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

---

[37] *See* U.S. Gov't, *How to Protect Your Networks from Ransomware*, 3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Aug. 27, 2024).

[38] *Id.*

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic....[39]

117. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates;
- Use threat and vulnerability management;
- Perform regular audit; remove privileged credentials.

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely.

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords.

**Apply principle of least-privilege**

- Monitor for adversarial activities;
- Hunt for brute force attempts;
- Monitor for cleanup of Event Logs;
- Analyze logon events.

118. Given that Defendant were storing the PII of Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks. Instead, Defendant failed to implement basic security measures, like password protection, encryption, or multifactor authentication.

[39] *See* Security Tip (ST19-001) *Protecting Against Ransomware*, Atlantic Pacific S.A.S. (Oct. 21, 2020), https://www.apintlcorp.com/articulos/articulo-ST19-001.html (last visited Aug. 27, 2024).

***Plaintiff's and Class Members' Damages***

119. To date, Defendant has done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant have only offered 12 months of inadequate and limited identity monitoring services, despite Plaintiff and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

120. The 12 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud.

121. Victims of data breaches often elect not to enroll in a monitoring product offered by the very entity that compromised their data. In other words, an offer of monitoring of the type made by Defendant in the wake of a breach is typically viewed with skepticism by the victims of breach because it requires victims to provide additional information to the vendor of the breached party.

122. Additionally, Defendant place the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach.

123. Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

124. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft, with attempts at mitigation of which require uncompensated time and

effort. These resources would not need to be expended by Plaintiff and Class Members but for the negligence and failures of Defendant to fulfill its duties.

125. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

126. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

127. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

128. Defendant's delay in noticing affected persons of the theft of their Private Information prevented early mitigation efforts and compounded the harm.

129. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out- of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and

f. Closely reviewing and monitoring Social Security numbers, bank accounts, and credit reports for unauthorized activity for years to come.

130. Moreover, Plaintiff and Class Members have an interest in ensuring that their Personally Identifiable Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is encrypted and password protected.

131. The retail cost of credit monitoring and identity theft monitoring services typically is more than $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from NextGen's Data Breach. This is a future cost that Plaintiff and Class Members would not need to bear but for NextGen's failure to safeguard their Private Information.

**CLASS ALLEGATIONS**

132. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated ("the Class"). The nationwide Class that Plaintiff seek to represent is defined as follows:

> All persons residing in the United States whose Private Information was actually or potentially accessed or acquired during the Data Breach for which Defendant Crown Equipment Corporation, provided notice to Plaintiff and other Class Members beginning on or around August 8, 2024, as identified in Defendant's records relating to the Data Breach.

133. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

134. Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

135. Numerosity. Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are certainly tens of thousands, and possibly in excess of 13,858[40] individuals whose Private Information was improperly accessed in the Data Breach, and each Class is apparently identifiable within Defendant's records.

136. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

d. Whether and when Defendant actually learned of the Data Breach;

e. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

f. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

[40] Office of the Maine Attorney General, *Data Breach Notifications*, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/27d01e13-84ad-4e71-a024-977d9ce7aa3a.html (last visited Aug. 27, 2024).

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

i. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

137. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised as a result of the Data Breach, due to Defendant's misfeasance.

138. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff have suffered are typical of other Class Members. Plaintiff have also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

139. Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable

advantages of judicial economy.

140. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

141. Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

142. Plaintiff and the Class repeat and re-allege paragraphs 1 through 142 of this Complaint and incorporate them by reference herein.

143. Plaintiff and Class Members were required to submit their Private Information to Defendant in order to receive healthcare or behavioral healthcare services from Defendant.

144. Plaintiff and Class Members entrusted their Private Information to Defendant on the premise and reasonable expectation that Defendant would safeguard their information, use

their Private Information for necessary business and required medical purposes only, and that Defendant would securely maintain the Private Information so that it was not accessible to, or able to be exfiltrated by cybercriminals.

145. Defendant has full knowledge of the sensitivity of the Private Information it collected and maintained and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

146. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiff and Class Members involved an unreasonable risk of harm to Plaintiff and Class Members, even if the harm occurred through the criminal acts of a third party.

147. Plaintiff and Class Members were the foreseeable victims of any inadquate safety and securty practices. Plaintiff and the Class Members had no ability to protect their PII that was in Defendants' possession. As such, a special relationship existed between Defendant and Plaintiff and the Class.

148. Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the Private Information of Plaintiff and Class Members in Defendant's possession was adequately secured and protected.

149. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement

(Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

150. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain.

151. Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the Private Information of Plaintiff and Class Members.

152. Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and Class Members entrusted Defendant, either directly or indirectly, with their confidential Private Information, a necessary part of obtaining services from Defendant.

153. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or Class Members.

154. A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

155. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and Class Members, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

156. Defendant's own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also

included its decisions not to comply with industry standards for the safekeeping of the Private Information of Plaintiff and Class Members, including basic encryption techniques freely available to Defendant.

157. Defendant was in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

158. Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and the precise types of data that were compromised and when. Such notice was necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, or repair any identity theft and fraudulent use of their Private Information by third parties.

159. Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the Private Information of Plaintiff and Class Members.

160. Defendant has admitted that the Private Information of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

161. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Private Information of Plaintiff and Class Members during the time the Private Information was within Defendant's possession or control.

162. Defendant improperly and inadequately safeguarded the Private Information of Plaintiff and Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

163. Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the Private Information of Plaintiff and Class Members in the face of

increased risk of theft.

164. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Private Information.

165. Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove the Private Information they were no longer required to retain pursuant to regulations.

166. Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiff and Class Members the existence and scope of the Data Breach.

167. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Nationwide Class, the Private Information of Plaintiff and Class Members would not have been compromised.

168. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

169. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including but not limited to the FTC Act, and common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable

risk of harm to Class Members from a data breach.

170. Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

171. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

172. Defendant's violation of Section 5 of the FTC Act constitutes negligence.

173. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

174. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

175. Defendant's duty to act reasonably in collecting, storing, and maintaining the Private Information, and to use reasonable care in protecting such information arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information that it either affirmatively acquires, maintains, or stores. Industry standards require Defendant to exercise reasonable care with

respect to Plaintiff and Class Members by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and Class Members. Industry best practices put the onus of adequate cybersecurity on the entity most capable of preventing a Data Breach. In this case, Defendant was the only entity that could adequately protect the data that it solicited, collected, and stored.

176. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of Plaintiff and Class Members; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

177. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including,

but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

178. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

179. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the Class)**

180. Plaintiff and the Class repeat and re-allege paragraphs 1 through 142 of this Complaint and incorporate them by reference herein. The allegation that there was an enforceable contract for data security is brought in the alternative to Plaintiff's tort and equitable claims.

181. Plaintiff and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

182. Plaintiff and Class Members were required to deliver, and did deliver, their Private Information to Defendant as part of the process of obtaining medical services provided by Defendant. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services.

183. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members

accepted Defendant's offers and provided their Private Information to Defendant.

184. Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services to Plaintiff and Class Members.

185. When Plaintiff and Class Members paid money and provided their Private Information to their healthcare providers, either directly or indirectly, in the exchange for goods and services, they entered into implied contracts with their healthcare providers and their business partners associates, including Defendant, and intended and understood that Private Information would be adequately safeguarded as part of that service.

186. Plaintiff and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

187. In accepting such information and payment for services, Plaintiff and the other Class Members entered into an implied contract with Defendant whereby Defendant became obligated to reasonably safeguard Plaintiff's and the other Class Members' Private Information.

188. In delivering their Private Information to Defendant and paying for healthcare services, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard the data as part of that service.

189. The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under state or federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

190. The implied promises include but are not limited to: (1) taking steps to ensure that

any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized medical purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

191. Defendant's implied promises to safeguard Plaintiff's and Class Members' Private Information are evidenced by, e.g., representations in Defendant's Privacy Policy described above.

192. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

193. Had Defendant disclosed to Plaintiff and Class Members that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and the other Class Members would not have provided their Sensitive Information to Defendant.

194. Defendant recognized that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiff and the other Class Members.

195. Plaintiff and the other Class Members fully performed their obligations under the implied contracts with Defendant.

196. Defendant breached the implied contract with Plaintiff and the other Class Members by failing to take reasonable measures to safeguard their Private Information as described herein.

197. As a direct and proximate result of Defendant's conduct, Plaintiff and the other

Class Members suffered and will continue to suffer damages in an amount to be proven at trial, or alternatively, nominal damages.

**COUNT III**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

198. Plaintiff and the Class repeat and re-allege paragraphs 1 through 142 of this Complaint and incorporate them by reference herein. This claim is brought in the alternative to Plaintiff's claims for the breach of any contractual obligations.

199. Plaintiff and Class Members conferred a monetary benefit on Defendant, by providing Defendant with their valuable Private Information.

200. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

201. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

202. Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

203. Defendant acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

204. If Plaintiff and Class Members knew that Defendant had not secured their PII, they

would not have agreed to provide their PII to Defendant.

205. Plaintiff and Class Members have no adequate remedy at law.

206. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

207. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

208. Defendant should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiff and Class Members proceeds that they unjustly received from them.

**<u>COUNT IV</u>**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On behalf of Plaintiff and the Class)**

209. Plaintiff and the Class repeat and re-allege paragraphs 1 through 260 of this

Complaint and incorporate them by reference herein.

210. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of the Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

211. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with its patients, in particular, to keep secure their Private Information.

212. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

213. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt or otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

214. Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

215. Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

216. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury, including but not

limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

217. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and economic and non-economic losses.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A. An Order certifying the Class, and appointing Plaintiff and their Counsel to represent the Class;

B. Equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members, and from refusing to issue prompt,

complete, any accurate disclosures to Plaintiff and Class Members;

C. Injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring Defendant to delete, destroy, and purge the personally identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v. prohibiting Defendant from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personally identifiable information, as well as protecting the personally identifiable information of Plaintiff and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employee's compliance with Defendant's policies, programs, and systems for protecting personally identifying information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personally identifiable information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. An award of damages in excess of twenty-five thousand dollars, including, but not limited to, actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E. Prejudgment interest on all amounts awarded; and

F. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demand that this matter be tried before a jury.

Date: August 27, 2024

Respectfully submitted,

/s/ Terence R. Coates

Terence R. Coates (0085579)
Spencer D. Campbell (103001)
Dylan J. Gould (0097954)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
*tcoates@msdlegal.com*
*scampbell@msdleagl.com*
*dgould@msdlegal.com*

Philip J. Krzeski (0095713)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue South, Ste. 1700
Minneapolis, MN 55401
Phone: (612) 339-7300
Fax: (612) 336-2940
*pkrzeski@chestnutcambronne.com*

*Attorneys for Plaintiff Roger Egbert and the Putative Class*